UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ALBERT M. HESTER | ) | BANKRUPTCY NO. 15-40930 |
| | ) | CHAPTER 7 |
| DEBTOR | ) | |
| | ) | |
| | ) | |
| HARINI CARDWELL | ) | |
| PLAINTIFF | ) | |
| v. | ) | ADV. NO. 15-04046 |
| ALBERT M. HESTER | ) | |
| DEFENDANT | ) | |

**MEMORANDUM**

This matter came before the Court for trial on August 16, 2016 and September 13, 2016. Both the Plaintiff, Harini Cardwell, and the Defendant, Albert M. Hester, appeared at trial and were represented by counsel. At the trial, the parties presented evidence, both written and documentary. Upon consideration of the evidence presented the Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

**FINDINGS OF FACT**

From 2007 to February 2015, the Plaintiff worked at a gasoline service station. The Defendant frequented the gas station on occasion, and became acquainted with the Plaintiff. At some point, the Plaintiff and Defendant agreed to start a pawn business together. While the Plaintiff had no experience in the pawn business, the Defendant was familiar with the operation of pawn shops due to his prior association with a different pawn store, Master Pawn. The parties agreed that they would be equal partners, with each sharing half the profits and half the expenses. Despite this arrangement, the Plaintiff provided the majority of the funding to start the business, including some

$15,000 used as operating capital.  The parties jointly leased the real property to be used for the pawn store, and each had a key to the store.  The operating funds were kept in a safe within the pawn store that had been left from the store's previous owner.  The safe was re-combinationed after the parties took control of the pawn store, and only the parties possessed the combination to the safe. Additionally, the Defendant installed a lock on the front door and only the Defendant and the Plaintiff possessed a key to this door, with both parties testifying that no copy of the key was ever made.

The business officially opened on February 1, 2015.  The pawn store was stocked with merchandise brought in by each party, as well as property from the party's family members, and items pawned at the store.  The evidence was not at all clear which specific items were brought in by the Plaintiff or by the Defendant.  The store made somewhere between thirty to forty pawns in its first week.

Shortly after the business began operating, on February 5, 2015, the Defendant was arrested on felony drug charges resulting in his incarceration.  A bond was set at $25,000 for his release from jail.  The Defendant called the Plaintiff from jail and asked her to bail him out of jail.  According to the Plaintiff, the Defendant promised to repay her the bond amount within a week.  The Plaintiff agreed to assist the Defendant in his release from jail because she still needed the Defendant to help her with the newly opened pawn store.

The Plaintiff testified that she provided the entire $25,000 bond amount.  She testified that she was able to put forward $5,000 of the bond funds, but that she had to borrow the other $20,000 from her former employer at the service station, Sam Gollan.  Plaintiff testified that no written agreement was created to document the loan from Mr. Gollan to the Plaintiff, and that she still was

obligated to repay these funds to Mr. Gollan.  Mr. Gollan testified corroborating these facts.

The Defendant testified to a different story.  He testified that $20,000 of the funds were his and the other $5,000 belonged to his cousin, Phillip Hester.  He stated that he kept these funds in an unlocked briefcase under the counter at the pawn store.  Due to asserting his Fifth Amendment right against self incrimination, the Defendant refused to testify where or how he came by these funds. The Defendant's mother, Robin Griffith, also testified that she was told by her son that the funds belonged to him.  Conversely, evidence was also admitted indicating that Ms. Griffith texted the Plaintiff stating that the funds belonged to the Plaintiff rather than the Defendant.  Ms. Griffith's testimony on this point was contradictory at best.

The bond was issued but the surety listed on the bond was Ms. Griffith, the Defendant's mother.  The Plaintiff testified that Ms. Griffith was listed rather than the Plaintiff because the Plaintiff was unfamiliar with the criminal process.

The Defendant also called Ms. Christina Muffet to testify on his behalf regarding the origination of the bond funds.  Ms. Muffet worked in the state court clerk's office, and was charged with the handling of bonds in criminal cases in 2015.  Ms. Muffet testified that she specifically remembered the Defendant's criminal case, the Defendant, the Plaintiff, and the Defendant's mother. She testified that the Defendant's mother presented the bond, but acknowledged the Plaintiff was present as well.  She also recalled there being a conversation between the Defendant's mother and the Plaintiff as to whose name to put the bond.  Ms. Muffet testified that neither the mother nor the Plaintiff wanted it in their name.  Ms. Muffet also testified she was not aware who possessed the funds prior to the arrival at the courthouse.  Finally, Ms. Muffet testified that the Plaintiff stated it was the Defendant's money.

After the criminal proceeding was completed, the bond amount[1] was returned to Ms. Griffith, who returned the funds to her son, the Defendant. The Plaintiff requested that the Defendant return the bail money to her, but the Defendant refused to repay the Plaintiff the $25,000. Instead, the Defendant used the funds to pay legal fees (both criminal and civil) and for general living expenses.

After the Defendant's release from jail, the Plaintiff decided she no longer wanted to partner with the Defendant in the pawn business. On February 13, 2015, the Plaintiff and Defendant went to the Occupational License Fee Division and removed the Defendant's name from the pawn shop account. The Defendant, however, retained his key to the store. February 16th was to be the Defendant's last day at the store.

On the night of February 15, 2015, the Defendant returned to the store, used his key and his knowledge of the combination to the safe to remove $14,000 from the safe. After discovering the theft, the Plaintiff contacted the Defendant. The Plaintiff testified that the Defendant admitted to her that he stole the $14,000 in cash. The Plaintiff further testified that the Defendant promised to repay the funds. To this end, the Defendant drafted a document setting forth his driver's license number and date of birth, and agreeing to repay the Plaintiff the $14,000 stolen. The Plaintiff testified that the Defendant signed this document in front of her and in her presence at the pawn shop.

The Defendant denied admitting he stole the funds, denied drafting the agreement referenced by the Plaintiff, and denied signing that agreement. However, the Plaintiff presented evidence of

---

[1] Some amount of the $25,000, perhaps 10%, may have been kept as a fee for the bond service.

the Defendant's signatures on other documents, and, to the Court's eye, the signatures on the agreement to repay and the other documents were identical.

The Plaintiff also testified that the Defendant returned at a later date and took another sum of money, in the $28,000 to $30,000 range, as well as large quantities of merchandise from the store. The Plaintiff provided a list of items, and their supposed value, that were allegedly removed from the store. This list originated solely from the Plaintiff's memory, as the official store inventory list was also stolen. The list consisted of items that both the Defendant and the Plaintiff originally contributed to the store, as well as items that had been brought in to pawn. The list of property included numerous high value items, such as a $499 cash register, $979 speakers, $900 handbags, $700 shirts, $500 dolls, a $2,999 watch, $2,700 in crystals, $649 in hunting accessories, a $1,000 silver picture, and a $1,800 laptop computer.

The Defendant challenged the accuracy of the list of items and values provided by the Plaintiff. He elicited testimony from the Plaintiff that she only had to repay a few hundred dollars of merchandise to the pawn customers. Both the Defendant's mother and girlfriend testified that the merchandise available in the store was of substandard quality and of low value. In fact, the Defendant's girlfriend described the pawn store as being in the nature of a "thrift store," with no high value items.

The Plaintiff initially called the police about the robbery. Upon questioning, the Defendant told the police that he was only recovering the property that he had contributed to the pawn store. The Defendant specifically denied taking any property that he did not contribute to the store upon its opening. Defendant also denied taking any funds as well.

Eventually, the Plaintiff had to close the pawn shop within a few weeks of its opening. A

5

few months later, on July 8, 2015, the Plaintiff filed suit against the Defendant in Daviess Circuit Court. In her complaint, the Plaintiff alleged conversion, breach of contract, intentional interference with contractual relations, intentional infliction of emotional distress, and unjust enrichment. The Defendant failed to answer or otherwise defend the action, and on September 16, 2015, a Default Judgment was entered in favor of the Plaintiff and against the Defendant in the amount of $94,624.00. It is unclear how this figure was derived from the allegations in the complaint.

On November 2, 2015, the Defendant filed for relief under Chapter 7 of the United States Bankruptcy Code. On December 31, 2015, the Plaintiff timely filed this adversary proceeding seeking to except the debts owed to the Plaintiff from discharge. The complaint sought a judgment declaring that the debt owed by the Defendant non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4) and/or (a)(6). The Defendant answered denying the allegations.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and venue is proper under 28 U.S.C. § 1409(a). The parties have submitted to the jurisdiction of this Court.

The Plaintiff seeks to except the debt owed by the Defendant from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and/or (a)(6). Section 523 provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
> ....
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

6

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(2)(A), (4) and (6).

The Plaintiff alleges that her claim against the Defendant falls within either or all of these sections.  The Plaintiff bears the burden of proving each of the elements of those sections of the Bankruptcy Code by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); In re Kennedy, 249 F.3d 576 (6th Cir. 2001).  Furthermore, exceptions to discharge are strictly construed against creditors.  Rembert v. AT & T Universal Card Servs. (In re Rembert), 141 F.3d 277, 280–81 (6th Cir. 1998).

Under 11 U.S.C. § 523(a)(2),  a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss.  Rembert v. AT & T Universal Card Servs. (In re Rembert), 141 F.3d 277, 280–81 (6th Cir. 1998) (footnote omitted). See also In re Looney, 453 B.R. 252 (6th Cir. BAP 2011).  A creditor must prove each of these elements by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

Under 11 U.S.C. § 523(a)(4), three distinct acts of malfeasance can create an exception to discharge, including "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  To withhold a debt from discharge for "fraud or defalcation while acting in a fiduciary capacity," the Court must find that an express or technical trust existed between the parties. Brady

v. McAllister (In re Brady), 101 F.3d 1165, 1173 (6th Cir.1996). Here, there was no evidence presented of an express or technical trust.

The term "fiduciary capacity," however, does not modify the words "embezzlement" or "larceny." In re James, 42 B.R. 265, 267 (Bankr. W.D. Ky. 1984). To succeed on a theory of embezzlement, the Plaintiff must prove that "(a) the Debtor appropriated funds for his own benefit, and (b) he did so with fraudulent intent or deceit. Both the intent and the actual misappropriation necessary to prove embezzlement may be shown by circumstantial evidence." Id. To succeed on a theory of larceny, the Plaintiff must show that the Defendant has "wrongfully and with fraudulent intent taken property from its owner." In re Rose, 934 F.2d 901, 903 (7th Cir.1991).

To establish that a debt is nondischargeable under 11 U.S.C. § 523(a)(6), a plaintiff must prove that the debtor not only intended the act that caused the harm, but intended the harm. See Kawaauhau v. Geiger, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). To succeed on this count, the Plaintiff must prove that the Defendant either (1) willed or desired to harm or (2) that harm was substantially certain to occur as a result of his behavior. Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 465 (6th Cir. 1999).

Before analyzing each claim and the evidence presented, the Court will first start with a discussion on the credibility of the two main witnesses, the Plaintiff and the Defendant. The Plaintiff testified as to the events that led up to and the subsequent closing of the short-lived pawn shop, as well as the actions taken with regard to the Defendant's arrest and subsequent posting of his bail. The Plaintiff was forthright and responded directly and promptly to questions, both on direct and on cross-examination. This Court found the Plaintiff to be a very credible witness.

The Defendant also testified. He appeared to be intelligent and capable of telling the

difference between truth and lies.  The Court found the Defendant's answers evasive, and very self-serving.  On the witness stand, the Defendant appeared to have a hostile attitude to both Plaintiff's counsel as well as his own attorney.  The Defendant provided very curt answers to the questions presented to him, and failed to elaborate on many of the answers he provided in his testimony.  The Court had ample opportunity to observe the Defendant and to listen to the answers he gave on both direct and on cross examination.  Simply speaking, the Court found the Defendant lacked credibility.

Turning to the counts in this case, the Court believes that the claims of the Plaintiff can be separated into four separate categories: 1) the debt arising from the posting of the bail; 2) the $14,000 debt arising from the theft; 3) the theft of the property from the store; and 4) the second theft of $28,000 -$30,000 from the store.

The Court will first address the bail bond.  The Court believes the funds used for the posting of this bond originated from the Plaintiff and not the Defendant.  The Plaintiff's testimony on this point was simply more credible than the Defendant's version of the story.  The Court believes the Defendant called the Plaintiff from jail and asked her to loan him funds to get out of jail.  The Court believes the Plaintiff borrowed the funds from her former employer, Mr. Gollan, and paid the bond for the Defendant's release.  The Court believes the Defendant promised to repay the funds to the Plaintiff, but instead used the returned funds for his own use.  Mr. Gollan's testimony completely corroborated the Plaintiff's testimony on this point.

As for Ms. Muffet's testimony, the Court will make a few observations.  First, it seems unlikely, if not implausible, that Ms. Muffet could recall a single bond case more than twenty months ago.  It would also seem equally implausible that Ms. Muffet could recall the specifics of conversations held between the Plaintiff and the Defendant's mother.  However, even assuming that

Ms. Muffet has such an excellent memory, her testimony is hardly conclusive as to the ownership of the bond funds.  The only testimony that Ms. Muffet gave which could lead to the conclusion that the funds belonged to the Defendant, was her recollection that the Plaintiff stated that it was the Defendant's money.  In light of the other testimony, the Court will construe this statement to mean the funds were <u>for</u> the Defendant, rather than the funds belonged <u>to</u> the Defendant.  The Court believes that this construction is the only interpretation which fits within the other specific credible testimony given by the Plaintiff and Mr. Gollan.

Applying these facts to 11 U.S.C. § 523(a)(2), the Court finds that the Defendant obtained $25,000 from the Plaintiff through the false material misrepresentation that he intended to repay the Plaintiff the funds used to secure his release from jail.  The Court finds that the Defendant intended to deceive the Plaintiff with this misrepresentation.  The Plaintiff justifiably relied upon the false statement which proximately  caused her loss.  <u>Rembert v. AT & T Universal Card Servs. (In re Rembert)</u>, 141 F.3d 277, 280–81 (6th Cir. 1998) (footnote omitted).   As such, the Court finds the debt of $25,000 should be excepted for discharge.

Next, the Court turns to the $14,000 stolen from the store.  The Court finds the Plaintiff's testimony on this topic to be credible, and finds that the Defendant stole these funds from the safe located at the pawn store.  This finding is supported by the Plaintiff's testimony that the Defendant admitted the crime to her, and by the written agreement to repay the funds.  The Court finds that the Defendant drafted and signed the agreement, evidencing an acknowledgement that he had wrongfully removed the $14,000 from the pawn store.

Applying these facts to 11 U.S.C. § § 523(a)(4). The Court finds that the Defendant appropriated these funds for his own benefit, and (b) he did so with fraudulent intent or deceit.

Alternatively, the Court finds the Defendant wrongfully and with fraudulent intent took this property from its owner, the Plaintiff.  In re Rose, 934 F.2d 901, 903 (7th Cir.1991).  Consequently, the Court finds this $14,000 debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

Alternatively, the Court finds this $14,000 debt nondischargeable under 11 U.S.C. § 523(a)(6).  Under that statute, a plaintiff must prove that the debtor either (1) willed or desired to harm or (2) that harm was substantially certain to occur as a result of his behavior.  Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 465 (6th Cir. 1999).  Here, the Defendant not only intended the act that caused the harm, but was substantially certain of the harm that would occur by his actions.  See Kawaauhau v. Geiger, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).  Stealing the funds was a willful or malicious act by the Defendant that directly injured the Plaintiff.  As such, the Court finds this $14,000 debt non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

The Court now turns to the debt arising from the theft of the merchandise located in the pawn store.  The Plaintiff testified that the items removed by the Defendant had a value in the $30,000 range.  The Defendant, his mother, and his girlfriend all testified that the items were nowhere near this value.  In this instance, the Court believes the account of the Defendant and his supporting witnesses.  The Court supports this finding by noting that the Plaintiff only had to reimburse pawn customers for a $200 watch, speakers of an unknown value, and $10 for other items.  If the items were of a higher value, the Plaintiff would undoubtedly been forced to reimburse more money to her former pawn customers.  The Defendant's girlfriend who described the items in the pawn store as similar to those sold in a thrift store also support the notion that the pawn store merchandise was not of a high value.

The Court also cannot give a judgment to the Plaintiff for these items because the evidence

11

was not at all clear about the ownership of each of the items on the list of property prepared by the Plaintiff. Each party testified that they each contributed items to be sold at the store. In addition to the items contributed by the parties, there were also items contributed by family members, as well as items actually pawned by customers. Without clear evidence as to the ownership of specific items, the Court is not in a position to award a non-dischargeable judgment in favor of the Plaintiff on this allegation.

The final category of debt is the $28,000 to $30,000 amount the Defendant allegedly stole on a second occasion. Of course, the Defendant denied taking any funds. The circumstances surrounding this second theft were at best ambiguous. In fact, Defendant's counsel was able to elicit testimony that in a prior deposition that the Plaintiff had admitted that only $28,000 to $30,000 in merchandise had been taken. In the deposition, the Plaintiff made no mention of an additional $28,000 to $30,000 in funds taken.

Additionally, the Plaintiff testified that her funds were low after the first theft. She also testified that she was forced to borrow funds from her former employer to pay the bail bond for the Defendant. It seems implausible that only a few days later, the Plaintiff would have another $28,000 to $30,000 available to be stolen in the pawn store. Based upon all the testimony, the Court cannot find that an additional $28,000 to $30,000 was taken by the Defendant. As such, the Court cannot grant the Plaintiff a nondischargeable judgment for these amounts as well.

## CONCLUSION

Simply speaking, as with most cases of this nature, the issue in this case came down to credibility. The Court needed to "see" the parties and consider their individual credibility. While the Plaintiff appeared to the Court to be honest and very credible, the Defendant was not. The

Defendant was evasive, inconsistent, and generally appeared to lack truthfulness. The evidence was clear that the Plaintiff provided the bail money, rather than the Defendant as the Defendant asserted. The evidence was also clear that the Defendant stole the $14,000 from the pawn store. This conclusion is supported by the Plaintiff's testimony that the Defendant admitted taking the funds, and by the document that the Defendant drafted and executed indicating an intent to repay these funds to the Defendant. The Court does not believe the Defendant would have signed this document if he had not taken the funds.

The Court, however, cannot grant the Plaintiff a non-dischargeable judgment for her other claims. With respect to the merchandise allegedly taken, the evidence was not at all clear which property belonged to the Plaintiff, to the Defendant, or to other people. Moreover, the Court cannot make an adequate determination of the merchandise's value due to the conflicting testimony as to the condition of the property. Additionally, the evidence did not support a finding that the Defendant stole an additional $28,000 to $30,000 from the Plaintiff. The Plaintiff's testimony on this point was not substantiated, and appeared to conflict with prior inconsistent testimony given at a deposition.       For the reasons set forth above, this Court holds that the Plaintiff's claim against the Defendant for $39,000 is nondischargeable under this bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2), (4) and (6). Each party is to bear their own fees and costs for the prosecution and defense of this adversary proceeding.

A separate Judgment consistent with this Memorandum Opinion will be entered this same date.

Alan C. Stout
United States Bankruptcy Judge
Dated: October 7, 2016

13

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ALBERT M. HESTER | ) | BANKRUPTCY NO. 15-40930 |
| | ) | CHAPTER 7 |
| DEBTOR | ) | |
| _____ | ) | |
| | ) | |
| HARINI CARDWELL | ) | |
| PLAINTIFF | ) | |
| v. | ) | ADV. NO. 15-04046 |
| ALBERT M. HESTER | ) | |
| DEFENDANT | ) | |

## JUDGMENT

Pursuant to the Court's Memorandum entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that judgment is granted in favor of the Plaintiff and against the Defendant and $39,000.00 of the $94,624.00 Daviess Circuit Court judgment is excepted from discharge under 11 U.S.C. § 523(a)(2), § 523(a)(4) and/or § 523(a)(6).

This is a final and appealable order and there is no just reason for delay.

_____
Alan C. Stout
United States Bankruptcy Judge
Dated: October 7, 2016